(August 10, 1925.)

CITIZENS BANK & TRUST COMPANY, a Corporation, THE NATIONAL BANK OF IDAHO AT POCATELLO, a Corporation, and CITIZENS BANK & TRUST COMPANY, a Corporation, as Trustee, Respondents, v. THE POCATELLO MILLING & ELEVATOR COMPANY, a Corporation, JOHN L. BARR, THE F. C. AYRES MERCANTILE COMPANY, a Corporation, ALLIS-CHALMERS MANUFACTURING COMPANY, a Corporation, Defendants, and . THE POCATELLO FLOUR MILLS COMPANY, a Corporation, Appellant.

[240 Pac. 186.]

PLEADING — ANSWER AND CROSS-COMPLAINT — DEFENSE — CONTRACT — COPY ATTACHED TO ANSWER — AFFIDAVIT OF CROSS-DEFENDANT — FAILURE TO MAKE — EFFECT — BANKS AND BANKING — OFFICERS — AGENCY—POWER TO BIND BANK—HOW SHOWN—EVIDENCE—CONTRACT—CONSIDERATION.

1. Where a contract is pleaded in an answer and a copy is attached thereto, failure to deny the genuineness and due execution thereof by affidavit, does not admit the same, under C. S., sec. 6705, when the answer and contract, construed together, do not constitute a defense founded upon a written instrument, but set up matters proper for a cross-complaint.

2. The authority of a president or cashier, acting as the managing head of a bank, to bind the bank, may be shown expressly, or may be implied from the facts disclosed, or be shown to exist and be established by the particular usage, practice or mode of doing business of the bank, or by the fact of ratification thereof or acquiescence therein by the bank.

3. Evidence examined, and contract *held* to be founded upon a valid consideration.

Publisher's Note.

2. Authority and implied powers of cashiers, see notes in 77 Am. Dec. 759; 12 Am. Rep. 75. See, also, 3 R. C. L. 440 et seq., 444 et seq.

APPEAL from the District Court of the Fifth Judicial District, for Bannock County. Hon. Robert M. Terrell, Judge.

Action to foreclose a mortgage. Judgment for plaintiffs. *Reversed and remanded, with directions.*

Peterson & Coffin, for Appellant.

In so far as the answer of the defendant, The Pocatello Flour Mills Company, to the foreclosure complaint of the plaintiffs was concerned, the failure of the plaintiffs to file an affidavit within ten days, denying the genuineness and due execution of Defendant's Exhibit "B," attached to its answer, precluded the plaintiffs from thereafter raising the question of the authority of the officers of, the Citizens Bank to execute said contract. (C. S., sec. 6705; *Austin v. Brown Brothers Co.,* 30 Ida. 167, 164 Pac. 95; *Cox v. Northwestern Stage Co.,* 1 Ida. 376; *Reynolds v. Pennsylvania Oil Co.,* 150 Cal. 629, 89 Pac. 610; *Knight v. Whitmore,* 125 Cal. 198, 57 Pac. 891; *Quartz Glass & Mfg. Co. v. Joyce,* 27 Cal. App. 523, 150 Pac. 648.)

Where one, without collusion or fraud, deals with a corporation, through an officer who is in active management of the corporate business, if the act done by such officer is one which the corporation might do, such corporation will be estopped from relying upon any lack of authority on the part of such officer as a defense against the rights of the party so dealing with the corporation. (*Pettingill v. Blackman,* 30 Ida. 241, 164 Pac. 358.)

Mrs. Greene, as president, had both the express and implied authority to enter into the contract in question with the cross-complainant herein. (*Allis-Chalmers Mfg. Co. v. Citizens Bank & Trust Co.,* 3 Fed. (2d) 316.)

Jones, Pomeroy & Jones, for Respondents.

Where answer and cross-complaint is filed in one instrument and copy of contract is attached at the end

of the cross-complaint, but is referred to in the answer and also relied upon and pleaded in the cross-complaint, an answer to the cross-complaint duly verified, denying the due execution or genuineness of the contract, is all that is required, as the law will not require a futile act. (*Cox v. Schnerr*, 172 Cal. 371, 156 Pac. 509; C. S., sec. 6704.)

Pleading an instrument by attaching copy to answer or cross-complaint as an exhibit does not tender an issue or involve an assertion of the truth of the statements and recitals contained in the exhibit. (*Sweeney v. Johnson*, 23 Ida. 530, 130 Pac. 997; *Schultz v. Rose Lake Lumber Co.*, 27 Ida. 528, 149 Pac. 726.)

The cashier or president acting as managing head of the bank does not have power to do every act which is within the powers of the bank, but his implied authority is restricted to the usual business of the bank and does not extend to unusual or extraordinary transactions. (*Stockmen's Nat. Bank v. First Nat. Bank*, 38 Ida. 395, 221 Pac. 150; *Sandy River Bank v. Merchants & Mechanics Bank*, 1 Biss. 146, Fed. Cas. No. 12,309; *First Nat. Bank v. Drovers' etc. Bank*, 244 Fed. 135, 156 C. C. A. 563; 3 R. C. L. 75; *Culpeper Nat. Bank v. Walter & Walter*, 114 Va. 522, 77 S. E. 484; *Arbogast v. American Exch. Nat. Bank*, 125 Fed. 518, 60 C. C. A. 538; *West St. Louis Sav. Bank v. Shawnee County Bank*, 95 U. S. 557, 24 L. ed. 490; 2 Thompson on Corporations, sec. 1532; *Smith v. Northampton Bank*, 4 Cush. (Mass.) 1; *Case v. Citizens' Bank*, 100 U. S. 446, 25 L. ed. 695; *State v. Forsyth*, 41 Mont. 249, 108 Pac. 914, 28 L. R. A., N. S., 501; 3 Fletcher on Corporations, p. 3315.)

The cashier is the chief executive officer, still he is but an agent and his acts are governed by general rules of agency, and if he exceeds his authority, his acts will not bind the bank. (3 R. C. L., sec. 71, p. 444.)

While C. S., sec. 5663, provides that a written instrument is presumptive evidence of consideration, yet such presumption of consideration will not overcome the express language therein, showing that it is without con-

sideration. (*Lane v. Richards,* 119 Iowa, 24, 91 N. W. 786; *Bender v. Been,* 78 Iowa, 283, 43 N. W. 216, 5 L. R. A. 596.)

TAYLOR, J.—This action was brought by the Citizens Bank (now Citizens Bank & Trust Company), individually and as trustee, and the National Bank of Idaho at Pocatello, to foreclose a mortgage given by the Pocatello Milling & Elevator Company as security for sums owed to respondents, and to the Citizens Bank as trustee for several parties named. A number of parties were made defendants, among them the appellant, the Pocatello Flour Mills Company, and the F. C. Ayres Mercantile Company, a *cestui que trust.* For brevity, we will refer to the Citizens Bank as the bank, the Pocatello Milling & Elevator Company as the milling company, the F. C. Ayres Mercantile Company as the Ayres company, and the Pocatello Flour Mills Company as appellant.

Respondents presented a motion to dismiss this appeal. It does not appear from the showing that the appellant has, voluntarily or otherwise, accepted benefits or received the advantages of the judgment so as to preclude it from prosecuting this appeal. The motion is denied.

The complaint alleges that—

" .... The claims or interests of said defendants and each of them, if any they have, are subsequent and subordinate and inferior to the lien of said mortgage."

The answer of appellant, so far as material herein, admits all of the allegations of the complaint, except that it denies that its claim "is subsequent or subordinate or inferior to the lien of the said mortgage; but on the contrary alleges the fact to be," as a part of the answer, that it has a mortgage upon the same property, given to it by the milling company on November 1, 1921, for a then existing debt in the amount of $19,817.20, with the further allegation:

" .... That the interest of this defendant in the property in said complaint described is specifically hereinafter set forth in the cross-complaint of this defend-

ant and is based upon the terms and conditions of that certain contract made and entered into between this defendant on the one part and the plaintiff, Citizens Bank & Trust Company, on the other part, on the 12th day of December, 1921, a full, true and correct copy of which said contract is hereto attached, marked exhibit 'B,' and by reference made a part of this answer the same as if set forth herein in full; and in this connection this answering defendant alleges'' that the bank, in the execution of that contract, was acting for itself and as trustee, as set forth in the complaint, and "that out of the proportionate share of the mortgaged premises or the proceeds thereof, to which the Citizens Bank, one of the plaintiffs herein, for itself and as trustee, is entitled, this answering defendant, under the terms of said contract as aforesaid, is entitled to an interest in the said mortgaged premises or the proceeds thereof,'' then proceeding to set out what that proportion was, and that the contract alleged was made, executed and delivered for a valuable consideration, "and that the same has been by the said Citizens Bank and by this answering defendant carried into effect, and that both of said parties have, since the execution and delivery of the said contract, changed their position on account thereof and by reason thereof.''

The appellant then "prays judgment that the plaintiffs be permitted to foreclose their mortgage as in said complaint set forth, and that the Court, after hearing, fix a reasonable attorney's fee to be allowed the plaintiff herein as a part of the costs of said actions, and that the Court in its decree fix the respective interests of the parties under and by virtue of that certain contract of December 12th, 1921, of which a copy is hereto attached as Exhibit 'B,' and for such other and further relief as to the Court may seem meet and equitable in the premises,'' and, "further answering plaintiff's complaint on file herein, and by way of cross-complaint thereto,'' appellant pleaded its mortgage and all facts necessary to foreclose it, and the contract with sufficient allegations to

enforce it, with a recital that a true and correct copy thereof, marked Exhibit "B," was annexed to and made a part of the cross-complaint, and prayed judgment foreclosing its mortgage, and for "such relief in the premises as shall be meet and equitable and as the said cross-complainant shall be entitled to under the provisions of the contract made and entered into with the plaintiff, Citizens Bank, (exhibit 'B,') on December 12th, 1921, as in this cross-complaint set forth; that in the decree of foreclosure the respective interests of the various parties be fixed by this Court in regard to the first and . second mortgages as in the complaint and this cross-complaint set forth and in regard to the said contract of December 12th, 1921."

A copy of the contract pleaded is attached, as Exhibit "B," to the answer and cross-complaint. The bank filed a verified answer to the cross-complaint, in which it specifically denied any authority for the execution of the contract, or consideration therefor. Judgment was entered foreclosing both mortgages, and decreeing that of respondents to be prior to that of appellant. The appeal is from that judgment.

Appellant assigns as error, among others, the findings and conclusions that: (1) The president of the Citizens Bank, in signing the contract pleaded, and the vice-president, in attesting it, acted entirely without authority from said bank; (2) The board of directors did not ' authorize or at any time ratify its execution; (3) There was no valid consideration for the contract; (4) It is not binding upon the Citizens Bank; and (5) It is void and of no effect; and (6) The admission and exclusion of certain evidence.

Appellant contends that, because the contract pleaded . and relied upon, which was signed by the "Citizens Bank, By I. N. Anthes, President," and attested by "Geo. A. Greene, Vice-pres.," was "set up as a part of the answer," under the provisions of C. S., sec. 6705, the authority of the officers signing was deemed admitted by the respondents' further failure to file an affidavit within

the time provided therein, denying the authority of the officers.

C. S., sec. 6705, provides as follows:

"When the defense to an action is founded on a written instrument, and a copy thereof is contained in the answer, or is annexed thereto, the genuineness and due execution of such instrument are deemed admitted, unless the plaintiff file with the clerk, within ten days after receiving a copy of the answer, an affidavit denying the same, and serve a copy thereof on the defendant."

The first question is: Is the answer of appellant a defense founded on a written instrument? Or, Is there a defense in the answer founded on the Exhibit "B" recited?

This court, in *Bacon v. Rice*, 14 Ida. 107, 93 Pac. 511, said:

"In this case the defendant might have put in issue the plaintiff's right to recover by denials alone. However, if the defendant desired to have title quieted in himself, as against the plaintiff, it was necessary that he file a cross-complaint. . . . . The cause of action set forth in defendant's cross-complaint was his title or interest in the lands involved. . . . . "

This court held, in *First Nat. Bank v. Bews*, 3 Ida. 486, 31 Pac. 816, an action upon a note, that the defendant might be permitted to show, in answer to the complaint, an agreement by which the plaintiff had collected sufficient proceeds out of mortgaged property to pay the note, but that, if defendant sought further an accounting by plaintiff for excess received over the face of the note,—

"The cause of action therein attempted to be set up must be set up in the form of a cross-bill separate and distinct from the answer, and stating a complete cause of action in itself. . . . . "

The contract, as pleaded in the answer, does not defeat the right of respondents to foreclose their mortgage. In fact, it specifically provides that—

" . . . . The party of the first part (the bank) . . . . notwithstanding the prior lien of the said mortgage . . . . will fully protect the party of the second part (appellant) as a junior encumbrancer, . . . . and that the party of the first part will prorate with the party of the second part all proceeds realized from the sale of said property under the proceedings for foreclosure of the first mortgage, in the event that said property is purchased by any person or persons other than the party of the first part, and in the event the said property is bid in by the party of the first part, the party of the first part will, upon receiving title thereto, convey to the party of the second part its proportionate interest in said property."

It would appear that the answer does not constitute a defense as new matter. It shows either "a cause of action arising out of the transaction set forth in the complaint . . . . or connected with the subject of the action," or a "cause of action arising also upon contract" in "an action arising upon contract" (C. S., sec. 6695), or that "the defendant seeks affirmative relief against" the plaintiff, "relating to or depending upon the contract or transaction upon which the action is brought, or affecting the property to which the action relates" (C. S., sec. 6699), in which event the matter pleaded is not a defense, but is either a counterclaim or a cross-complaint. As to which one of these it is, we need not determine. The appellant has pleaded the matter as a cross-complaint, and as far as determination of this case is concerned, it is not material which the appellant called it, but if it be a counterclaim or cross-complaint, it is not a defense in contemplation of the statute. In fact, it is not a denial of respondent's cause of action, but new matter, seeking affirmative relief. Appellant's denial that its mortgage was subsequent, subordinate and inferior to that of respondents was, in the light of the answer and contract pleaded, not a defense founded on a written instrument, but, to make it effective, needed just what appellant did file, a cross-com-

plaint, asking affirmative relief.   (*Bacon v. Rice, supra.*)

"The test of the sufficiency of a defense is whether, taking all of the allegations of the complaint to be true, it nevertheless would defeat the action if proved." (*Silver & Co. v. Waterman,* 127 App. Div. 339, 111 N. Y. Supp. 546.)

See, also, *Yarger v. Chicago, M. & St. P. R. Co.,* 78 Iowa, 650, 43 N. W. 469; *Haywood v. Seeber,* 61 Iowa, 674, 16 N. W. 727; *Bush v. Prosser,* 11 N. Y. 347; *Skains v. Barnes,* 168 Ala. 426, 53 So. 268; *Whitfield v. Aetna Life Ins. Co.,* 125 Fed. 269.

The bank specifically denied the cross-complaint, to which the same Exhibit "B" was attached, by a verified answer as required by C. S., sec. 6704, which was sufficient to raise the genuineness and due execution of the written instrument so far as the cross-complaint was concerned. A pleader should not be permitted, under such circumstances, to say to the plaintiff:

"Although I may be mistaken as to which it is, I have pleaded this matter as a cross-complaint, and you have overlooked something, for I also referred to it in, and attached a copy to, my answer, and you have not denied that by affidavit."

The purpose of this requirement is to apprise the party pleading a written instrument whether his opponent does or does not admit its genuineness and due execution.

C. S., sec. 6707, is as follows:

"In the construction of a pleading for the purpose of determining its effect, its allegations must be liberally construed with a view to substantial justice between the parties."

We must, therefore, consider the evidence as to the genuineness and due execution of Exhibit "B" with relation to the error assigned. The proof establishes that in October, 1920, the milling company was indebted to the Citizens Bank, to the National Bank of Idaho, and to various other creditors, in the amount set forth in respondent's mortgage, given on October 11, 1920, and due in one year. When the mortgage was given, the milling

company leased the elevator part of the property to the Ayres company, which paid a rental for the elevator and financed the purchase of grain for the mill, the rent being paid to the bank and applied upon the mortgage indebtedness, the milling company operating the mill itself.

When the creditors met in August, 1921, in Pocatello, in the operation of the mill there had been lost approximately $65,000. The rental on the elevator had been paid, and this indebtedness was owing almost wholly to the Ayres company, by reason of advancements by it for the purchase of grain for the mill. However, there existed about $45,000 worth of current assets applicable to the indebtedness due the Ayres company. In July and August of 1921, all of the creditors of the milling company, either in person or by some representative, held and participated in conferences for the purpose of arriving at some solution of the situation. Conferences and negotiations resulted in a contract being entered into between the Ayres company on one side, and the bank, as trustee for all the mortgage creditors, on the other. This contract was introduced by the appellant as Exhibit 6. The first paragraph of this contract is significant as setting forth a "brief outline" representing "the mutual agreement of both parties as to the immediate solution of the financial difficulties of The Pocatello Milling & Elevator Company."

The contract recites that whereas the bank holds mortgage notes of the milling company to the amount of $113,965.74, and is indorser or guarantor in the sum of $67,343.56 more, making a total of $181,309.30, due to the first party; and whereas, the Ayres company holds one of these mortgage notes for $9,500, and is an unsecured creditor to the amount of approximately $65,000, this above amount representing all of the indebtedness of the milling company except four small creditors amounting to $3,109, the bank, as trustee for the mortgagees, agrees to waive foreclosure for a period of one year on the mortgage coming due on October 11, 1921, and to permit the milling company to lease its elevator

and mill to the Ayres company "and its interests," with the option to the Ayres company "or its interests" to renew the lease for further periods of one year to cover a total lapse of five years from August 15, 1921, it being understood that waiver of foreclosure of the mortgage shall continue during the life of the lease; both parties agree to reduce the rate of interest to five per cent on notes held by them, amounting to $123,465.74, and to make this interest rate effective from April 11, 1921. The Ayres company agreed to lease the elevator at an agreed figure, and keep in storage sufficient wheat to meet the milling requirements, sell wheat to the milling company "at average cost price on the date of purchase by mill," all expense of operating the elevator to be paid by the company operating the mill including repairs necessary to keep it in efficient operation, any new equipment or improvements to be borne by the lessee, and to remain its property at the termination of the lease. It was agreed that the Ayres company should incorporate a company · to lease and operate the mill as lessee of the milling company, this lease to include, with consent of all creditors, the transfer, by the Pocatello Milling & Elevator Company, of its current assets, including cash, accounts and notes receivable considered good, merchandise on hand (not including capital stock notes held by the bank as collateral) and current liabilities and indebtedness owing to the Ayres company by the milling company, and—

"Any deficiency existing between the assets and liabilities so transferred shall be covered by a second mortgage note given The Operating Company by The Pocatello Milling & Elevator Company, with a further agreement from the Trustee of the secured creditors that in event foreclosure of the first mortgage is carried out, that the holder of this second mortgage note will participate in the first mortgage proceeds on a *pro rata* basis with other secured creditors."

Further provision is made that, as a rental for the mill, the newly incorporated operating company shall pay the

Pocatello Milling & Elevator Company a monthly rental, on a graduated scale; that at the close of each fiscal year, the milling company shall receive twenty-five per cent of the net profits of the operating company; that all rentals paid the milling company, and all moneys received by them, from whatever source, be deposited with the bank as trustee, and disbursed by the trustee in the payment of premiums on fire insurance, general and annual corporation taxes, and interest on the indebtedness specifically set forth, being all of the claims named, including one listed at $20,000, indebtedness of the "newly incorporated operating company"; all surplus funds to be applied on the total indebtedness of the milling company on a *pro rata* basis.

On behalf of the bank, this instrument was signed, "Citizens Bank, Trustee, First Party, I. N. Anthes, Pres." It was also signed by the F. C. Ayres Mercantile Company, and witnessed by I. S. Lambing, an officer of the milling company. The record shows that, with the knowledge, consent and active participation of the bank, all of these provisions were carried out, except the placing of the $19,817.20 mortgage of appellant on a par with the mortgage of the bank. This, too, was accomplished if it may be found from the evidence that the contract, Exhibit "B," was duly executed, or was authorized or ratified.

Respondents' argument that Exhibit 6 was not pleaded, or in any manner made an issue under the pleadings, is not well founded. It was a matter of evidence, properly admissible to establish the facts and circumstances surrounding the execution of Exhibit "B." There is no force in the contention that Exhibit 6 was executed by Citizens Bank, Trustee, and that its agreement was only as trustee, while Exhibit "B" was executed by Citizens Bank. The bodies of the two instruments may be looked at to ascertain what was intended by them, and if the first authorized, and was authority for the second, then the second, Exhibit "B," is directly executed by the Citizens Bank, doing as to its indebtedness and that of the trustee what Exhibit 6 provided with relation to all of the indebtedness.

It was shown in evidence that one of the directors of the bank, a witness for respondents to refute the authority of the president and vice-president to sign Exhibit "B," joined in the execution as secretary and in the acknowledgment of an agreement, dated September 13, 1921, executed by all the creditors, extending the mortgage notes for one year.

A lease of the "mill" was proven, executed August 31, 1921, in accordance with, and reciting in exact terms the rental and conditions of application of the proceeds and prorating thereof by the bank as set forth in Exhibit 6. The new operating company was organized, the elevator was leased to it in accordance with the terms of Exhibit 6, the interest on the indebtedness, including that to the bank, was reduced from eight per cent to five per cent, the time of payment of the first mortgage was extended for a year, the current assets of approximately $45,000 were turned over to the new operating company, and a mortgage given to it for the balance, which is the mortgage pleaded by appellant. All of this was done on or before December 12, 1921, when Appellant's Exhibit "B" was executed to place appellant's mortgage upon an equality with the mortgage of the bank.

The parties proceeded to operate, and continued to operate, under all of the provisions of the contract, Exhibit 6, and the leases and mortgages, according to the conditions thereof. Appellant operated the mill, paid rent and even advanced rent money when not due. The bank handled the rents and income of the milling company, the mortgagor, and applied the funds upon interest and indebtedness. The genuineness and due execution of Appellant's Exhibit 6, providing for all this, was never questioned. The president of the bank testified that she signed Exhibit "B," and that there were many informal meetings, with a majority of the directors present, when the affairs were being discussed. It was shown that the president had always been entrusted with the management and control of the affairs of the bank; that she had especially handled the account of the Pocatello

Milling & Elevator Company; and that the other directors had given it little attention.

Respondents' contention that "A cashier has no implied power, merely by virtue of his office, to give away, surrender or release the securities of the bank. He can do no act which so operates," presupposes that this was apparent at the time, or was done at the time knowingly. The whole course of dealing of the bank with the affairs involved shows that the execution of Exhibit "B" fits into the other agreements and contracts which the bank had made and which are conceded to have been authorized. It was and is only one of the steps which the bank had agreed to take by its execution of Exhibit 6, and is perhaps one of the few steps provided for in Exhibit 6, which, in any way, could be detrimental to the interests of the bank. The bank received all the benefits which might accrue from the performance of the many other provisions of Exhibit 6.

The authority of a cashier is not always incident to the office of president, but in this instance the president of the bank was shown to have been exercising all of the powers and duties usually incident to the office of cashier, bringing the facts within the principles applicable to the official acts of a cashier.

The authority of an officer, such as a president or cashier, of a bank, must be viewed in the light of the facts at the time when the authority was exercised. The fact that some act of the president might thereafter, or did thereafter, turn out to be less beneficial than might be reasonably expected, is not a sole criterion by which to judge whether the act, when done, appeared to be for the benefit of the bank, or did not appear to be extraordinary, or out of the ordinary or due course of the duty of the officer. If the act, when committed, might reasonably be expected to accomplish a beneficial purpose, and if done to bring about the accomplishment of other beneficial purposes, the fact that the one act itself thereafter might prove detrimental should not be weighed by itself, but in the light of all of the other circumstances and provisions (of Exhibit 6), in relation to

the manner in which the whole beneficially affected the interests of the bank, or might reasonably be contemplated to do so.

"A bank, after authorizing and permitting its cashier to speculate or to deal, even with outside matters, will not be permitted to take the chances to receive benefits, and repudiate the transactions in case of loss. . . . . Any contract made by the cashier acting within the reasonable or apparent scope of his authority, or made by him when acting with the knowledge and approval of the board of directors, will be binding on the bank." (2 Thompson on Corporations, 2d ed., sec. 1535.)

The contention of respondents and the court's findings and conclusions seem based upon the same premise, as shown all through the record by rulings that—

" . . . . The signatures of the officers of the bank was not a proper legal act of the corporation itself, unless accompanied by proper resolution of a meeting of the Board of Directors authorizing them so to do, or unless the by-laws of the corporation expressly confers such authority upon them as the general executive officers of the bank."

Respondents cite many cases to support their contention that the cashier or president, acting as managing head of a bank, does not have power to do every act which is within the powers of the bank, but his implied authority is restricted to the usual business of the bank, and does not extend to unusual or extraordinary transactions. Each adjudicated case must, in a measure, depend upon its own peculiar facts. The cases cited by respondents, however, are even themselves authority for the proposition that the authority of such officer from the bank may be shown expressly, or may be implied from the facts disclosed, or be shown to exist and be established by the particular usage, practice or mode of doing business of the bank, or by the fact of ratification thereof or acquiescence therein by the bank. (*Stockmen's Nat. Bank v. First Nat. Bank,* 38 Ida. 395 (400), 221 Pac. 150 (152).) This principle may be drawn from the above case, although the court was there

discussing the action of an officer, without authority of the board of directors, with reference to a matter which was in excess of the bank's own powers, and not within the range of ordinary banking business. See, also, *Sandy River Bank v. Merchants & Mechanics' Bank,* 1 Biss. 146, Fed. Cas. No. 12,309, to the same effect.

Nothing in the by-laws pleaded, requiring previous authorization or subsequent ratification of the board of directors, is at variance with the conclusion herein when such authority may be shown under the foregoing principles.

From other of respondents' citations, we excerpt the following, supporting the same principles:

"Ordinarily, the cashier, being the ostensible executive officer of a bank, is presumed to have, in the absence of positive restrictions, all the power necessary for such an officer in the transaction of the legitimate business of banking." (*West St. Louis Savings Bank v. Shawnee County Bank,* 95 U. S. 557, 24 L. ed. 490.)

"Cashiers of a bank are held out to the public as having authority to act according to the general usage, practice and course of business conducted by such institutions; and their acts, within the scope of such usage, practice and course of business, will, in general, bind the Bank in favor of third persons 'possessing no other knowledge.' . . . .

"Official acts may be performed by a cashier which constitute the ordinary and customary functions of such an officer, and persons dealing with the bank are warranted in believing that the cashier is duly authorized to perform any customary duty falling within the scope of that category, and may to that extent hold the bank responsible, as if he was so authorized, however the fact may be, save only in cases where his want of authority is affirmatively proved, and actual knowledge of that fact is brought home to the third party." (*Case v. Citizens' Bank,* 100 U. S. 446, 25 L. ed. 695.)

"The scope of banking business is constantly enlarging, and the usual course of business becoming broader. The number and rapidity of banking transactions require banks

to rely on the authority and good faith of the executive officer of correspondent banks." (*First Nat. Bank v. Drovers & Mechanics' Nat. Bank,* 244 Fed. 135, 156 C. C. A. 563.)

This court, in *Pettengill v. Blackman,* 30 Ida. 241, 164 Pac. 358, has announced the principle properly applicable herein:

"Where a party deals with a corporation in good faith and he is unaware of any defect of authority or other irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists."

We might well excerpt and quote, as conclusions herein, the conclusions of Judge Dietrich in *Allis-Chalmers Mfg. Co. v. Citizens' Bank & Trust Co.,* 3 Fed. (2d) 316, involving some of the same facts and circumstances, and conclude that the authority of the officers of the bank has been shown, in accordance with established principles, to exist and be established by the usage, practice and mode of doing business of the bank, such usage being ratified or acquiesced in by the bank, and that, considering all the circumstances, we see no "valid reason . . . . for holding that the transaction was extraordinary, or of such a character that it required the express and formal authorization of the board."

Appellant assigns as error the conclusion of the court that "there is and was no valid consideration" for the contract, Appellant's Exhibit 3, Exhibit "B" attached to appellant's answer and cross-complaint.

C. S., secs. 5663 and 5664, provide as follows:

"Sec. 5663.   A written instrument is presumptive evidence of a consideration.

"Sec. 5664.   The burden of showing a want of consideration sufficient to support an instrument lies with the party seeking to invalidate or avoid it."

The contract was introduced in evidence, and the respondents offered no proof of failure of consideration.   The

court's conclusion, therefore, must rest upon a construction of the contract itself, and not upon other evidence.

A benefit to a third person is sufficient consideration for a promise. Where a promise is made for the benefit of several persons, it is not essential to a recovery thereon that each of such persons should have contributed to the consideration. (13 C. J., p. 325, sec. 164.) This contract recited the mortgage made by the milling company, and the lease, made by the appellant, of the mill and warehouses, as part of the consideration. The trial court should have considered all the evidence properly bearing upon the consideration, and had a right to take into consideration the circumstances of the transactions of the parties, and the various obligations and promises related thereto and connected therewith, which furnished a consideration and supported the contract. One of the inducements for appellant to make the lease and mortgage, and to assume assets and liabilities of the milling company, and extend for a year the time of payment of the open account by taking a mortgage for it, was that the bank would extend the time for payment of its mortgage and place appellant's mortgage on a par with that of the other secured creditors. The court was in error in holding that the contract Exhibit "B" was without consideration.

The judgment is reversed and the lower court directed to enter judgment of foreclosure accordingly, placing the mortgage of appellant upon an equality with the interest of respondent Citizens Bank & Trust Company in the mortgage of respondents, and enforcing the contract made between appellant and the said respondent. Costs awarded to appellant.

William A. Lee, C. J., and Wm. E. Lee and Givens, JJ., concur.

(October 3, 1925.)

ON PETITION FOR REHEARING.

TAYLOR, J.—Respondents, on petition for rehearing, urge that the original opinion should have modified, instead of having reversed, the judgment of the lower court.

The appeal herein was from "that certain portion of the Decree . . . . whereby it was adjudged that the lien of this defendant and cross-complainant . . . . was inferior to and subject to the liens of the plaintiffs . . . . , this . . . . Appeal being from each and every portion of the said Decree, wherein it is adjudged that the lien of the plaintiffs and each and all of them, . . . . is superior to or prior to the lien of this cross-complainant in any respect whatever, and from that portion of the said decree and all portions of said decree by which it is adjudged that upon the sale of the mortgaged property, the proceeds thereof shall be applied to the claims of the plaintiffs, before being applied to the claims of this defendant and cross-complainant."

Such an appeal and the record did not require the reversal of several important features of the judgment. The original opinion is hereby changed that the judgment be "modified" instead of "reversed." In making this change, we do not pass upon or mean to be understood as determining whether any sale suggested in the petition as having been made should or should not be vacated. If it becomes necessary or proper for the lower court, in modifying and carrying out such judgment, to make restitution of any property or rights lost, that matter, in the absence of a showing here, should be left to the determination of the lower court in the first instance.

A rehearing is denied.

William A. Lee, C. J., and Wm. E. Lee and Givens, JJ., concur.